UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-cv-61277-BLOOM/Reid

GARY LUCAS,

    Plaintiff,

v.

OFFICER CABEZAS and
OFFICER ARCHER,

    Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a bench trial that took place on May 28, 2019. The parties submitted their closing arguments and proposed findings of fact and conclusions of law following the filing of the trial transcript. *See* ECF No. [102] (Plaintiff's Proposed Findings of Fact and Conclusions of Law); ECF No. [103] (Defendants' Closing Argument and Proposed Findings of Fact and Conclusions of Law). The Court has carefully considered the testimony and other evidence presented at trial, the applicable law, and the parties' submissions. Set forth below are the Court's relevant findings of fact and conclusions of law.

### I. INTRODUCTION

This case arises as a result of an encounter between Plaintiff Gary Lucas ("Lucas") and Defendants, City of Hollywood Police Officers Archer ("Archer"), Cabezas ("Cabezas"), and Sinnes ("Sinnes") in 2017. Plaintiff filed this lawsuit on June 28, 2017, alleging that Defendants used excessive force against him during the course of his arrest, specifically after he was handcuffed. As a result, he sustained physical injuries and pain and suffering. Lucas asserts a claim against Defendants under 42 U.S.C. § 1983 for violation of his Fourth Amendment rights.

## II.   FINDINGS OF FACT

### A. The parties involved

Gary Lucas was born and raised in Hollywood, Florida. He suffers from schizophrenia and depression. He has at least one prior felony conviction within the last ten years. Lucas was married in 2002. He has been a widower since 2014, after his wife died of congenital heart failure. Before becoming disabled in 2008, he worked in various industries, including construction and fast food, and he had his own business at one time.

Officer Andrew Archer was hired as a police officer in the Hollywood Police Department in July of 2013. He is assigned to the Neighborhood Team Unit and tasked with being a liaison between the community and police department.

Officer Rolando Cabezas is a member of a Community Oriented Policing Unit, in which he also acts as a liaison between the community and police department. He is specifically tasked with integrating himself within the community, addressing complaints from the community, and identifying and devising responses to specific problems. Cabezas has been a police officer for just over five years.

Officer Michael Sinnes has been a Hollywood police officer for seven years and is currently in the Neighborhood Services Division. His duties include dealing with chronic and specific problems of the residents of the east side of Hollywood, and he too acts as a liaison between the community and the police department.

On the day of Lucas's arrest, Archer, Cabezas, and Sinnes were members of the same unit.

### B. Events leading to Lucas's arrest

On May 19, 2017, Lucas was living with his sister, Carmella Gardner ("Gardner"), at 2239 Forrest Street. At the time, Lucas was aware that there could be an active warrant for his arrest

because he had missed a previous court hearing on March 2, 2017. Archer knew that Lucas had outstanding warrants, as Archer and Lucas had had previous encounters. Archer had ticketed Lucas multiple times for parking his car in an alleyway behind his previous residence. During their previous encounters, Lucas would come out of his residence and video record Archer ticketing his vehicle.

On the morning of May 19, 2017, Lucas testified that he was outside his sister's house cleaning his bicycle. Officers Cabezas and Archer testified that Lucas was walking his bicycle on Forrest Street. The Officers were riding together that day in a Tahoe police vehicle to patrol their assigned area, which included Forrest Street. As they approached 2239 Forrest Street, Archer, who was driving, pointed out Lucas and told Cabezas that he had outstanding active warrants. Cabezas decided to exit the vehicle with the intention of apprehending Lucas. When Lucas realized that the Tahoe was approaching and saw Cabezas exiting, he turned and ran through the front gate and into his sister's house. Cabezas followed Lucas to the front door of the house, which had not closed behind him. Upon seeing three black males inside the house and a large aggressive dog, Cabezas decided not to follow Lucas in the house. Cabezas shut the door to the house and returned to the Tahoe. Cabezas radioed a request for other available Neighborhood Team Leaders, while Archer verified the status of Lucas's warrants. As the Officers contemplated how to proceed, they heard glass breaking in the rear of the house.

### C. The arrest

Cabezas reacted first, by running along the east side of the house toward the back yard, where he saw Lucas exiting a back window of the residence. After Lucas had entered the house, he ran directly to the back room and closed the door. In the room, he used the curtain on the window to break the window outward so he could exit the house through the window. Cabezas

then arrived in the back yard. Once out of the house, Lucas moved toward a small fenced concrete parking area in the back yard, where he attempted to jump over the gate. However, as he tried to jump over, the gate swung open, and Cabezas was able to grab him in a bear hug. Cabezas and Lucas became confined to a space between a sports utility vehicle ("SUV") parked on the concrete area and the fence. According to Cabezas, Lucas was jerking his upper body in attempts to get away from Cabezas, who had Lucas's arms pinned against his chest.

Archer had followed behind Cabezas as he ran to the back yard. Archer arrived when Cabezas and Lucas were between the SUV and the fence. At that point, Archer pulled Cabezas toward the yard, where both Cabezas and Lucas fell to the ground, with Lucas face down. There, while Cabezas still had a hold of Lucas, Archer got on top of Cabezas to help him hold Lucas down, as Lucas was attempting to break Cabezas's grip on him. According to Lucas, as they were going to the ground, he was attempting to discard two baggies he was holding in his hands, which he eventually was successful in discarding under the parked SUV in the yard. Once on the ground, Archer was able to grab Lucas's left hand and Cabezas was able to grab Lucas's other hand so that Archer could place him in handcuffs. According to Cabezas, Lucas had continued to try to pull away from the Officers, even once he was on the ground.

### D. Events after Lucas was handcuffed

Once Lucas was handcuffed, the version of events diverges significantly. According to Lucas, after he was handcuffed, the Officers lifted him up, Cabezas grabbed the back of his head, and slammed his face into the hood of the SUV parked in the yard at least nine times, while Archer punched and kicked him. Lucas warned the Officers that his sister had surveillance cameras and that their actions were being recorded. As a result, Lucas testified that Archer then signaled Cabezas to move Lucas to the back of the SUV and outside of the view of the cameras, and they

4

continued to punch him in the chest and face, and knee and kick him in the legs. During the beating, Lucas testified that he noticed another police Tahoe approaching the back of the house in the alleyway. The officer who exited the Tahoe, who Lucas identified as Sinnes, then began to also punch Lucas. After some time, Cabezas took hold of Lucas at the bottom of the driveway near the alley and started swiping at Lucas's feet to try to make him fall in a puddle of water left by rain from the night before. Lucas testified that after Cabezas realized that Lucas was trying to brace himself not to fall, Cabezas grabbed him by the back of the shirt and right arm, and swiped hard at his legs, causing Lucas to fall hard on his right side and onto the driveway. At that point, Cabezas knelt in front of Lucas and punched him in the face and chest, while Lucas was also being kicked in the back. Sinnes then opened the door to the Tahoe and the Officers lifted Lucas up and put him in the back seat of the SUV.

The Officers tell a different story. According to Cabezas and Archer, once Lucas was handcuffed and Archer was performing a pat-down, Lucas continued to try to pull away from the Officers. Cabezas, who was the officer holding Lucas, testified that he did not want to be headbutted or spat on, so he pushed the top half of Lucas's body down onto the hood of the vehicle and held his head down for approximately twenty seconds. Although the Officers found nothing on Lucas's person during the pat-down, they did find the two transparent resealable plastic baggies Lucas had thrown under the SUV, which contained a white rock-like substance. Instead of walking Lucas to the front of the house, the Officers decided to call a unit to the back alley to transport Lucas to the front so that he could be transferred into Archer's Tahoe. According to the Officers, it was Officer Djokic who responded to the alley, not Officer Sinnes. As Cabezas was walking Lucas to Djokic's vehicle, Lucas went completely limp and fell to the ground. Cabezas and Djokic picked Lucas up and put him in the back of Djokic's vehicle. Cabezas testified that he did not see

Sinnes until he returned to the front of the house, and Sinnes testified that he did not go to the back alley at any point, nor did he witness Lucas being taken into custody.

### E. Final transfer at the front of the house and surveillance footage

Once at the front of the house, Lucas was transferred from Djokic's vehicle to the back seat of Archer's Tahoe. Cabezas walked back to the front of the house and met Archer and Sinnes there. Archer began to complete a probable cause affidavit, and Sinnes field tested the substance found in the two baggies discarded by Lucas. By the time Cabezas got back to the front of the house, Lucas's sister, Gardner, had also arrived. Archer was speaking to Gardner. After speaking, she invited Cabezas into the house to review the surveillance video. Cabezas and Djokic were able to review the footage, which included more than eight different angles from both the front and back of the house. According to Gardner, Cabezas recorded the footage on his cell phone, though Cabezas denies doing so. Ultimately, the footage was lost because Gardner accidentally deleted or taped over it on her home equipment, and the footage was not collected as evidence by the police.[1]

### F. Injuries

Gardner also had the opportunity to speak with Lucas through the open door of Archer's Tahoe before the Officers took Lucas to jail. Gardner testified that when she saw Lucas, he was bleeding from his forehead and from one of his wrists.[2] Although Cabezas and Archer testified that Lucas did not complain of any injuries, Lucas testified that he sustained numerous injuries as a result of the Officers' actions after he was handcuffed. These injuries included a cut on his left wrist and dark bruises, a bruise to his right arm where he fell on the ground, scratches under his

---

[1] Lucas also presented evidence regarding the Hollywood Police Department's Standard Operating Procedures ("SOP") regarding conducting investigations and evidence collection.

[2] Gardner admitted on cross examination that she later gave a sworn statement in which she denied that Lucas had any injuries.

left eye, swelling above his left eye and on the right side of his face, scratches on his left knee, and scratches on his ankle from being swiped. Lucas also testified that since May 19, 2017, he has experienced frequent intense recurring headaches, extreme right shoulder pain, lower back pain, and neck pain—none of which he experienced prior to the Officers beating him and for which he has received medical treatment while incarcerated.[3]

### III. CONCLUSIONS OF LAW

Lucas asserts one claim under 42 U.S.C. § 1983 for excessive use of force by Officers Cabezas, Archer, and Sinnes after he was handcuffed.

In order to state a claim under section 1983, a plaintiff must plead that he was (1) deprived of a right; (2) secured by the Constitution or laws of the United States; and (3) that the alleged deprivation was committed under color of state law. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999); *Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001); *Myers v. Bowman*, 713 F.3d 1319, 1329-30 (11th Cir. 2013). Under established precedent, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007). "That standard asks whether the force applied is objectively reasonable in light of the facts confronting the officer, a determination we make from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (internal quotations

---

[3] Defendants also provided testimony from Major Boris Millares, who conducted the internal inquiry investigation into Lucas's complaint of force against the Officers, which did not result in any official action against the Officers.

omitted).

Determining the reasonableness of force used in a given case requires a careful balancing of the nature and quality of the intrusion on the individual's rights against government interests. *See Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *Crosby v. Paulk*, 187 F.3d 1339, 1351 (11th Cir. 1999). "[G]enerally no bright line exists for identifying when force is excessive." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000). As such, the Court considers a number of factors, including "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Williams v. Bauer,* 503 F. App'x 858, 861 (11th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). The Eleventh Circuit also instructs that "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002). In addition, the Court considers "the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted." *Mobley*, 783 F.3d at 1353 (internal citation and alteration omitted).

Nevertheless, "[t]he application of gratuitous force on an already-handcuffed and compliant detainee or arrestee constitutes excessive force in violation of the Fourth Amendment, even if there is no visible or compensable injury." *Gomez v. United States*, 601 F. App'x 841, 850 (11th Cir. 2015); *see Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011) (stating "that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment.").

## IV. ANALYSIS

Lucas contends that Defendants should be liable for excessive use of force because they

punched, kicked, kneed, swiped at his legs causing him to fall, and slammed his head into the hood of the SUV parked in the back yard after he was restrained in handcuffs and no longer resisting.

### A. Officer Sinnes

At the outset, the Court notes that Lucas has failed to show by a preponderance of the evidence that Officer Sinnes participated in any use of force, much less excessive force, as he was not present during Lucas's arrest. Archer and Cabezas testified that it was Officer Djokic who responded to the back alley, and Sinnes testified that he arrived on-scene once Lucas was already in the back seat of Archer's Tahoe. The only task Sinnes performed was field testing the substance in the baggies Lucas discarded during the course of his arrest. Beyond Lucas's own testimony, which the Court does not find convincing on this point, Lucas provides no other evidence establishing that Sinnes participated in his arrest. As such, the Court finds that judgment must be entered in favor of Officer Sinnes on Lucas's claim.

### B. Use of force by Archer and Cabezas

Archer's and Cabezas's use of force prior to handcuffing is not at issue in this case. Rather, Lucas contended at trial that the Officers used excessive force after he was handcuffed when they kicked, punched, and kneed him repeatedly, and slammed his head into the hood of the SUV parked in the back yard of Gardner's house. In addition, Lucas contends that the Officers' failure to collect the surveillance video from Gardner gives rise to a reasonable inference that the video contained evidence that would tend to inculpate them.

However, the Court finds that Lucas has failed to establish by a preponderance of the evidence that Cabezas and Archer used excessive force against him after he was handcuffed, without the need to consider the circumstances regarding preservation of the video. The injuries he testified to, and which were depicted in the photographs admitted into evidence at trial, are

more consistent with the Officers' version of events.

At trial, Lucas admitted to fleeing from the Officers and did not dispute that he was attempting to discard the baggies he was holding while the Officers were attempting to take him into custody. Lucas's injuries, depicted in the photographs admitted into evidence, are inconsistent with the level of force that Lucas testified was used upon him by two Officers—repeated slamming of his head into the hood of the SUV, punching in the face and chest, and kneeing and kicking. The Court has considered the relative weight and size of the parties and the circumstances leading to the confrontation. Lucas testified at trial that in order to exit the back of his sister's house, he used a curtain to push out the glass window, which he admitted he had to break to get through. Lucas admitted that he climbed through the window and jumped to get out of the house. Lucas's testimony is consistent with Officer Cabezas's testimony that he heard the glass break and saw Lucas jumping out of the window. In addition, Lucas admitted that he fell to the ground twice during his interactions with Cabezas and Archer. Lucas fell once when Archer pulled Cabezas and Lucas down, and again when Lucas was being taken to Djokic's Tahoe in the back alley.

As a result, the Court finds that Lucas's injuries are equally consistent with other circumstances. This includes Lucas's quick exit from his sister's house through a broken window while attempting to flee from the Officers and falling to the ground and attempting to discard the baggies while he was face down with Cabezas and Archer on top of him attempting to gain control of his arms. Although Lucas testified that he had not sustained any injuries until after he was handcuffed, the Court does not find that his testimony is supported by the evidence.[4]

---

[4] Thus, the Court does not consider Lucas's argument that Major Millares's testimony regarding the inquiry investigation is improper, as the Court reaches its conclusion independent of such testimony.

## V. CONCLUSION

For the foregoing reasons, the Court finds that Lucas has failed to meet his burden to establish his claim of excessive use of force, and therefore judgment must be entered in favor of Defendants upon Lucas's claim. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter judgment by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 6, 2019.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record